**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                               )
RACHELLE BAKER and JASON DITTMANN, )
individually and on behalf of all  )
others similarly situated,         )
                                   )
                Plaintiffs,        )
                                   )        Civil Action
        v.                         )        No. 18-11175-PBS
                                   )
EQUITY RESIDENTIAL MANAGEMENT,     )
L.L.C., and EQR-WALDEN PARK, LLC,  )
                                   )
                Defendants.        )
_____)
```

**MEMORANDUM AND ORDER**

July 1, 2019

Saris, C.J.

**INTRODUCTION**

Plaintiffs Rachelle Baker and Jason Dittmann bring this class action lawsuit against the owner and manager of their former apartment complex ("Walden Park"), Defendants Equity Residential Management, L.L.C. and EQR-Walden Park, LLC (collectively, "Equity"). They claim Equity failed to provide adequate heat and hot water systems and undertook an unnecessarily disruptive construction project to attempt to fix the systems. On behalf of other tenants in the apartment complex, they allege that Equity breached the implied covenant of quiet enjoyment and implied warranty of habitability, was unjustly

1

enriched, and violated Mass. Gen. Laws ch. 93A. Before Equity removed the case to federal court, the state court certified two classes. Equity moves to decertify these classes for failure to satisfy Federal Rule of Civil Procedure 23(b)(3)'s predominance requirement. Equity also moves for summary judgment on the quiet enjoyment and Chapter 93A claims.

After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** Equity's motion to decertify (Docket No. 36) and **DENIES** Equity's motion for summary judgment (Docket No. 38).

## FACTUAL BACKGROUND

The following facts are undisputed unless otherwise indicated.

## I.   Walden Park's Heat and Hot Water Problems

Located in Cambridge, Massachusetts, Walden Park consists of two adjacent buildings (205 Walden Street and 225 Walden Street) with 231 apartments of different sizes and layouts. Equity purchased Walden Park, which was about fifty years old at the time, in late 2011. When it purchased Walden Park, Equity prepared a capital improvement plan of maintenance projects it anticipated completing over a ten-year period. The plan included replacing valves in each apartment to better control the flow of heat and hot water.

Baker and Dittman rented Apartment 1L at 225 Walden Street from April 2011 (a few months before Equity purchased the

complex) until March 2016. While they lived at Walden Park, they experienced repeated heat and hot water outages. Between November 2011 and March 2014, they notified Equity at least eighteen times of an issue with heat or hot water. Equity responded to only some of their complaints. Baker and Dittman also made a number of complaints to the Cambridge housing inspector. Because of the heat and hot water issues, they used a space heater provided by Equity for at least a year starting in the fall of 2013 and warmed water on the stove to use to bathe. They never withheld rent, but they managed to negotiate their rent to stay the same each time they renewed their annual lease. They did not move out despite the heat and hot water problems because of the proximity of the apartment to Dittman's work and the expense of moving.

The heat and hot water problems were not limited to Baker and Dittmann's apartment. Between November 2011 and March 2014, Equity received hundreds of complaints from other Walden Park tenants about insufficient heat and hot water. Equity was also cited by the Cambridge housing inspector for failing to provide adequate heat and hot water on at least one occasion.

## II.   **Admitted Outages" of Heat and/or Hot Water**

On forty-six days between April 12, 2012 and April 24, 2014, Equity sent emails to the Walden Park tenants about building-wide utility issues. Twenty-seven of these "admitted outages" concerned issues in both Walden Park buildings, while nineteen

involved only 225 Walden Street. These emails referenced many
different types of outages. Some outages involved both heat and
hot water, others just one or the other (or water more
generally). Equity's own maintenance projects caused some of the
outages, while others were attributable to failing equipment,
emergencies, or factors beyond Equity's control (such as city
utility work or a tenant accidentally flipping a switch outside
the boiler room). Some emails provided notice of a day-long
outage, others of a brief outage. Some explained that an outage
may occur, others that an outage already occurred. In one June
2012 email, Equity acknowledged it had shut off the heat in
anticipation of the summer but agreed to turn it back on due to
the unseasonably cold weather.

III. **Maintenance Projects**

Equity undertook three major maintenance projects at Walden
Park. First, from April 2012 through May 2013, Equity converted
the boilers from oil to natural gas (the "Conversion Project").
Equity notified its tenants that this project would reduce heat
and hot water outages, but an Equity employee testified that the
purpose of the project was to save money.

After receiving a number of complaints about the heat during
the winter of 2012-2013, Equity commissioned a report from R.W.
Sullivan on Walden Park's heating systems. R.W. Sullivan provided
Equity with its recommendations for improving the systems on May

4

13, 2013. Equity immediately began maintenance work to implement some of R.W. Sullivan's recommendations, which continued until the fall (the "Heat System Modification Project").

On July 3, 2014, Equity notified the Walden Park tenants that it was starting a project the following week to replace leaking heat pipe risers in every apartment to improve the heating systems. This "Riser Replacement Project" involved replacing two pipes in the walls of each apartment, but the exact nature of the construction depended on the layout of the apartment. The email explained that contractors would have to open the wall in one or two corners of each apartment to access the pipes and that tenants would have to move their furniture away from these corners. The work would take place in each apartment over five to seven nonconsecutive days. Equity informed the tenants that it would not be able to tell them in advance when the contractors would be working in each apartment. The Riser Replacement Project lasted until September.

During the Riser Replacement Project, a number of tenants contacted Equity about the construction. Some asked about the schedule or requested that contractors finish up quickly or not enter an apartment on a certain day. Others made a wide variety of complaints about the construction. See Dkt. No. 75-3 at 29 (complaining that the contractors twice left his air conditioning unit on after finishing work in his apartment); id. at 42-43

(explaining that the contractors left her apartment dirty multiple times, locked her out, and interfered with her infant's sleeping schedule); id. at 74 (mentioning the thick layer of dust, exposed nails, cracked baseboards, and cockroaches in her apartment).

Plaintiffs' attorneys, who had filed this lawsuit the year prior, contacted Equity about these disruptions. After urging from the state court, Equity agreed to provide a two-week window for each apartment during which the construction would occur, address reasonable objections from tenants to the timeframe provided, and give ongoing construction updates. Plaintiffs allege that Equity did not fulfill these promises.

### PROCEDURAL HISTORY

Plaintiffs filed suit against Equity in Middlesex Superior Court on August 15, 2013 on behalf of a class of Walden Park tenants. The complaint raises five causes of action: willful and intentional violation of Mass. Gen. Laws ch. 186, § 14 (Count I), breach of the implied covenant of quiet enjoyment (Count II), breach of the implied warranty of habitability (Count III), unjust enrichment (Count IV), and violation of Mass. Gen. Laws ch. 93A, §§ 2, 9 (Count V). Equity removed the case to federal court on the basis of diversity jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"). On Plaintiffs' motion, the court (Collings, J.) remanded the case to state court for failure

to satisfy CAFA's $5 million amount-in-controversy requirement. See Baker v. Equity Residential Mgmt., L.L.C., 996 F. Supp. 2d 1, 8 (D. Mass. 2014).

Back in state court, Equity moved for partial summary judgment. On August 5, 2016, the state court granted Equity summary judgment on Count I because Equity's communication with its tenants when there were problems belied the notion that its failure to provide heat and hot water was willful or intentional. The state court rejected Equity's argument that Baker and Dittmann could not recover for breach of the implied warranty of habitability because they did not withhold rent. Finally, while the state court recognized that Baker and Dittmann could not receive a double recovery via their unjust enrichment claim, they could continue to pursue this claim as an alternative theory of relief.

Plaintiffs moved for class certification under Massachusetts Rule of Civil Procedure 23 after the close of fact discovery. On June 27, 2017, the state court certified the following two classes:

> Conversion Class: "all persons who were tenants occupying either building during the Conversion Project (May 1, 2012 through May 30, 2013), the Heating System Modification Project (July 1, 2013 through December 31, 2013), and/or the Riser Replacement Project (July 7, 2014 through September 30, 2014)"; and

<u>Admitted Outage Class</u>: "all persons who were tenants
in either building on any of the 27 dates for which
[Equity has] admitted outages, and all persons who
were tenants in 225 Walden Street on any of the 19
dates for which [Equity has] admitted outages in that
building only."

Dkt. No. 1-4 at 3-4, 9. The court held that Walden Park's 231

apartment units met the numerosity requirement and that the

classes satisfied commonality because all the alleged outages

affected at least one of the buildings in its entirety.

Plaintiffs were typical and adequate class representatives

because they were standard occupants of Walden Park and able and

willing to represent their fellow tenants. As to predominance and

superiority, the court noted that class members may have suffered

individualized damages but that liability was based on common

questions. For the same reasons, the court certified the classes

for their Chapter 93A claim.

On May 30, 2018, Plaintiffs produced an expert report

alleging classwide damages of up to $10 million. Based on this

report, Equity removed the case to federal court under CAFA for

the second time on June 5, 2018. Plaintiffs moved to remand on

the basis of untimeliness, arguing that Equity could have figured

out that damages exceeded $5 million before receiving their

expert report. <u>Baker v. Equity Residential Mgmt., L.L.C.</u>, 318 F.

Supp. 3d 440, 441-42 (D. Mass. 2018). This Court denied the

motion to remand. <u>Id.</u> at 442.

Equity filed two motions after the close of expert discovery. Equity seeks decertification of the classes and summary judgment on Count II (implied covenant of quiet enjoyment) and Count V (Chapter 93A).

**DISCUSSION**

## I.   Legal Standards

The Court lays out the legal standards for Plaintiffs' substantive causes of action, which are relevant for both the motion to decertify and motion for summary judgment.

### A.   Implied Covenant of Quiet Enjoyment

Under Mass. Gen. Laws ch. 186, § 14, a landlord is liable if he "directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant." This statutory cause of action incorporates the common law claim for breach of the implied covenant of quiet enjoyment. See Al-Ziab v. Mourgis, 679 N.E.2d 528, 529 (Mass. 1997); Simon v. Solomon, 431 N.E.2d 556, 565 (Mass. 1982). Thus, "during the rental of any residential premises, there exists an implied covenant and a statutory right of quiet enjoyment." Jablonski v. Casey, 835 N.E.2d 615, 619 (Mass. App. Ct. 2005). This right of quiet enjoyment protects a tenant from "serious interference" with his tenancy, meaning any "acts or omissions that impair the character and value of the leasehold." Andover Hous. Auth. v. Shkolnik, 820 N.E.2d 815, 824

n.17 (Mass. 2005) (quoting Doe v. New Bedford Hous. Auth., 630 N.E.2d 248, 255 (Mass. 1994)).

A landlord need not act intentionally to interfere with a tenant's right to quiet enjoyment. Al-Ziab, 679 N.E.2d at 529. Instead, liability under the covenant of quiet enjoyment requires only "a showing of . . . negligent conduct by a landlord." Id. at 530. For example, a landlord is liable if he has notice of the interfering condition and fails to rectify it. See Cruz Mgmt. Co. v. Thomas, 633 N.E.2d 390, 395 (Mass. 1994). Compare Jablonski v. Clemons, 803 N.E.2d 730, 733-34 (Mass. App. Ct. 2004) (finding interference with quiet enjoyment where the landlord did not fix a dangerous ventilation problem he knew about for nine years), with Casey, 835 N.E.2d at 619-20 (upholding a trial court's finding that a landlord who corrected the defective conditions within two weeks of notification did not breach the covenant of quiet enjoyment). Simply attempting to fix the condition, however, does not absolve a landlord of liability because "there is no good faith defense to . . . breach of the covenant of quiet enjoyment." Clemons, 803 N.E.2d at 734.

A landlord who interferes with a tenant's quiet enjoyment is "liable for actual and consequential damages or three month's rent, whichever is greater." Mass. Gen. Laws ch. 186, § 14. The measure of actual damages is "the difference between the value of what the [tenant] should have received and the value of what he

did receive." Clark v. Leisure Woods Estates, Inc., 45 N.E.3d 908, 912 (Mass. App. Ct. 2016) (quoting Darmetko v. Bos. Hous. Auth., 393 N.E.2d 395, 398 n.4 (Mass. 1979)). A tenant can recover "all reasonably foreseeable losses," including for economic harm, as consequential damages. Id. (quoting Simon, 431 N.E.2d at 570). The statutory minimum damages of three months' rent provide "an incentive to the pursuit of relief where the actual and consequential damages are slight or are difficult to prove." Darmetko, 393 N.E.2d at 398. If actual and consequential damages are lower than three months' rent, the tenant is entitled to only one award of triple rent, "no matter how many ways the landlord interferes with the tenant's quiet enjoyment." Clark, 45 N.E.3d at 914. A tenant cannot recover twice based on the same conditions for breaches of the covenant of quiet enjoyment and warranty of habitability. Curtis v. Surrette, 726 N.E.2d 967, 972 n.14 (Mass. App. Ct. 2000).

## B. Implied Warranty of Habitability

Every residential lease contains an implied warranty that "the premises will be delivered and maintained in a habitable condition." Simon, 431 N.E.2d at 561. The Sanitary Code establishes the minimum requirements for a habitable residence in Massachusetts. See Bos. Hous. Auth. v. Hemingway, 293 N.E.2d 831, 844 n.16 (Mass. 1973). The implied warranty of habitability therefore requires the landlord to maintain an apartment in

11

compliance with the Sanitary Code. See Scott v. Garfield, 912 N.E.2d 1000, 1005 (Mass. 2009).

Not every violation of the Sanitary Code, however, constitutes a breach of the implied warranty. S. Bos. Elderly Residences, Inc. v. Moynahan, 76 N.E.3d 272, 281 (Mass. App. Ct. 2017). The tenant must show that the violation was "material" or "substantial." E.g., Kelly v. Jones, 954 N.E.2d 35, 37 (Mass. App. Ct. 2011); Fletcher v. Littleton, 859 N.E.2d 882, 885 n.7 (Mass. App. Ct. 2007). To determine if a breach is material or substantial, courts consider "(a) the seriousness of the claimed defects and their effect on the dwelling's habitability; (b) the length of time the defects persist; (c) whether the landlord received written or oral notice of the defects; (d) whether the residence could be made habitable within a reasonable time; and (e) whether the defects resulted from abnormal conduct or use by the tenant." Casey, 835 N.E.2d at 618-19 (alterations omitted) (quoting Hemingway, 293 N.E.2d at 843-44). Accordingly, "the precise scope of the warranty depends on the circumstances of the case." Trs. of Cambridge Point Condo. Tr. v. Cambridge Point, LLC, 88 N.E.3d 1142, 1151 (Mass. 2018); see also Hemingway, 293 N.E.2d at 843 ("The existence of a material breach will be a question of fact to be determined in the circumstances of each case."). To establish a breach of the implied warranty, a tenant need not show fault on the landlord's part. See Scott, 912 N.E.2d

12

at 1006 n.8 ("[T]he applicable standard is one of strict liability, rather than one of negligence . . . .").

A tenant who suffers a breach of the implied warranty of habitability is entitled to damages equal to "the difference between the value of the dwelling as warranted . . . and the value of the dwelling as it exists in its defective condition." Cruz Mgmt. Co. v. Wideman, 633 N.E.2d 384, 387 (Mass. 1994) (quoting Hemingway, 293 N.E.2d at 845); see also S. Bos. Elderly Residences, 76 N.E.3d at 280 (noting that the measure of damages is "how much the defects reduced the value of the residence"). While the agreed-upon rent may be evidence of the value of the dwelling as warranted, Wideman, 633 N.E.2d at 387, a landlord cannot avoid paying damages by renting out the apartment for less than its fair market value, see Haddad v. Gonzalez, 576 N.E.2d 658, 668 (Mass. 1991).

**C. Unjust Enrichment**

Unjust enrichment provides a cause of action for a plaintiff without an adequate remedy at law. See Santagate v. Tower, 833 N.E.2d 171, 176 (Mass. App. Ct. 2005); see also Bos. Med. Ctr. Corp. v. Sec'y of Exec. Office of Health & Human Servs., 974 N.E.2d 1114, 1132 (Mass. 2012) (explaining that a claim of unjust enrichment will not lie "where there is a valid contract that defines the obligations of the parties"). To recover for unjust enrichment, the plaintiff "must establish not only that the

13

defendant received a benefit, but also that such a benefit was unjust." Metro. Life Ins. Co. v. Cotter, 984 N.E.2d 835, 850 (Mass. 2013). The measure of damages for unjust enrichment is "the reasonable value of the benefit conferred." Nassr v. Commonwealth, 477 N.E.2d 987, 991 n.4 (Mass. 1985).

D.    **Chapter 93A**

Under Mass. Gen. Laws ch. 93A, § 2(a), it is unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." As relevant here, a landlord can violate Chapter 93A in two ways. See S. Bos. Elderly Residences, 76 N.E.3d at 286. First, the Attorney General has promulgated regulations that define conduct that constitutes unfair or deceptive acts or practices in the landlord-tenant context. See 940 Mass. Code Regs. 3.17; S. Bos. Elderly Residences, 76 N.E.3d at 286. Second, a "substantial and material breach of the implied warranty of habitability" constitutes a violation of Chapter 93A, Thomas, 633 N.E.2d at 395, as does a breach of the implied covenant of quiet enjoyment, see Dorgan v. Loukas, 473 N.E.2d 1151, 1153 n.3 (Mass. App. Ct. 1985). A Chapter 93A violation entitles a tenant to actual damages, but a tenant cannot recover twice for both an underlying habitability or quiet enjoyment claim and a Chapter 93A claim. S. Bos. Elderly Residences, 76 N.E.3d at 286. If the court finds "a knowing or willful disregard of the conditions in

14

the apartment" on the part of the landlord, it must award between double and treble actual damages. Thomas, 633 N.E.2d at 396.

## II.   **Motion to Decertify**

Equity moves to decertify both the Conversion Class and the Admitted Outage Class for failure to satisfy the predominance requirement of Federal Rule of Civil Procedure 23(b)(3). Plaintiffs propose modifying the Conversion Class to a new "Riser Replacement Class" and oppose decertification of the Admitted Outage Class. After laying out the Rule 23 and predominance standards, the Court addresses modification of the Conversion Class to the Riser Replacement Class and then decertification of the Admitted Outage Class.

### A.   **Rule 23 and Predominance**

"[A] district court may decertify a class if it appears that the requirements of Rule 23 are not in fact met." Mazzei v. Money Store, 829 F.3d 260, 266 (2d Cir. 2016) (quoting Sirota v. Solitron Devices, Inc., 673 F.2d 566, 572 (2d Cir. 1982)). A court may also modify a class based on "subsequent developments in the litigation." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160 (1982); see also Fed. R. Civ. P. 23(c)(1)(C). The question of who bears the burden on a motion to decertify is not settled. See Day v. Celadon Trucking Servs., Inc., 827 F.3d 817, 831 n.5 (8th Cir. 2016) (surveying the caselaw). The Court need not resolve this question because, as discussed in detail below,

15

Equity has demonstrated that modification of the Conversion Class to the Riser Replacement Class does not comport with Rule 23 while Plaintiffs have shown that continued certification of modified classes based on Admitted Outage Class is justified.

To certify a class under Rule 23(b)(3), a court must find, inter alia, "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). This predominance inquiry "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016). Common questions are those for which the class can present the same, classwide evidence, while individual questions require different evidence for each class members. Id. In evaluating predominance, a court must "ask[] whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." Id. (quotation omitted); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624 (1997) (requiring courts to consider both the number of individual and common questions and their significance). A court must also ensure that "any dissimilarity among the claims of class members can be dealt with in a manner that is not 'inefficient or unfair.'" In re Asacol Antitrust Litig., 907 F.3d 42, 51 (1st Cir. 2018) (quoting Amgen Inc. v. Conn. Ret. Plans &

Tr. Funds, 568 U.S. 455, 470 (2013)). "[A] class may be certified notwithstanding the need to adjudicate individual issues so long as the proposed adjudication will be both 'administratively feasible' and 'protective of defendants' Seventh Amendment and due process rights.'" Id. at 52 (quoting In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015)).

Accordingly, a class can satisfy predominance even though its claims raise some individual questions. See Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39 (1st Cir. 2003); see also Amgen, 568 U.S. at 469 ("Rule 23(b)(3) . . . does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." (cleaned up)). The fact that some individual analysis of damages is required, for example, does not by itself defeat predominance. See Smilow, 323 F.3d at 40. In order to evaluate whether common questions predominate over individual questions, a court "must formulate some prediction as to how specific issues will play out." Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 298 (1st Cir. 2000); see also Amgen, 568 U.S. at 465-66 (permitting courts to examine the merits of the case as necessary to determine whether predominance is satisfied). As such, the predominance requirement "cannot be reduced to a mechanical, single-issue test." Waste Mgmt., 208 F.3d at 296.

### B.    Riser Replacement Class

Plaintiffs' modified Riser Replacement Class consists of "all persons who were tenants at Walden Park during the period of the Riser Replacement Project, which was July 7, 2014 through September 30, 2014." Relying on Winchester v. O'Brien, 164 N.E. 807 (Mass. 1929), Plaintiffs contend that the Riser Replacement Project caused intrusion, confusion, noise, dirt, and dust that violated the implied covenant of quiet enjoyment. They plan to prove liability on a classwide basis via the following common evidence: 1) email notices from Equity to all tenants that explained the duration, nature, and extent of the work to be done in each apartment; 2) testimony from Peter McGing from Equity that the project involved replacing two pipes in each apartment; 3) more than thirty complaints submitted by tenants about disturbances resulting from the construction; and 4) testimony from Cara Anne Miller, another Equity employee, that Equity failed to comply with its agreement to reduce the disturbances.

This common evidence is insufficient on its own to prove classwide liability for breach of the covenant of quiet enjoyment. The email notices and McGing's testimony are common evidence that Equity replaced two pipes in the walls of each apartment over five to seven nonconsecutive days. While the purpose and timing of the construction in each apartment may have been identical, this common evidence does not show that the

construction constituted a <u>serious</u> interference with each
tenant's quiet enjoyment of his or her apartment. The project
likely affected each apartment differently based on its layout,
how the tenant used the space, and how Equity performed the work.
For example, as McGing testified, the nature of the work in each
apartment depended on the apartment's layout. If the pipes being
replaced were located in a bathroom in one apartment, that tenant
would have suffered a greater intrusion than a tenant in an
apartment in which the pipes were located in the entryway. The
project would affect a tenant who worked from home more than a
tenant who traveled for work each week. Answering the question of
whether the project constituted a serious interference requires
individual proof about each tenant, the conditions in his or her
apartment, and the work Equity performed in the apartment.

Plaintiffs contend that the set of thirty tenant complaints
about the project serves as common proof that the project
constituted a serious disruption for all class members. But the
varied nature of the complaints confirms that the effect of the
construction in each apartment is an individual question. One
tenant complained that the contractors left her apartment dirty
multiple times, locked her out, and interfered with her infant's
sleeping schedule. Another mentioned the thick layer of dust,
exposed nails, cracked baseboards, and cockroaches in her
apartment. In contrast, a third tenant complained that the

contractors twice left his air conditioning unit on after
finishing work in his apartment. Other "complaints" simply
requested that contractors conduct the work efficiently or not
enter an apartment on a certain day. Because of the varied nature
of the complaints, the Court cannot reasonably assume that the
project interfered identically with each tenant's use of his or
her apartment. Instead, the project appears to have affected each
apartment in a unique way, some of which may constitute breaches
of quiet enjoyment and some of which may not. Answering the
individual questions concerning the conditions in each apartment
and the tenant's ability to use his or her space would overwhelm
any common questions about the nature of the project and Equity's
justification for it. There is also no way to adjudicate these
individual questions in a way that is both "administrative
feasible and protective of [Equity's] Seventh Amendment and due
process rights." Asacol, 907 F.3d at 52 (quotation omitted).

To the extent Plaintiffs seek to certify the Riser
Replacement Class for their three other causes of action,
certification is not warranted for the same reasons. Given the
variety of complaints about the project, Plaintiffs cannot show
via common proof that the project caused uninhabitable conditions
in each apartment for their habitability claim. While a thick
layer of dust, exposed nails, cracked baseboards, and cockroaches
may render an apartment uninhabitable, leaving the air

conditioning running does not. Whether Equity was unjustly
enriched by a tenant's rent payments also depends on the specific
conditions in his or her apartment. The Chapter 93A claim relies
on an underlying quiet enjoyment or habitability violation, which
they cannot prove via common evidence. The Court cannot certify
the Riser Replacement Class for any cause of action because it
fails to meet the predominance requirement of Rule 23(b)(3).

### C.   Admitted Outage Class

As certified by the state court, the Admitted Outage Class
consists of "all persons who were tenants in either building on
any of the 27 dates for which [Equity has] admitted outages, and
all persons who were tenants in 225 Walden Street on any of the
19 dates for which [Equity has] admitted outages in that building
only." In its decertification motion, Equity emphasizes that
Plaintiffs cannot prove the conditions in each apartment during
each "outage," and thus breaches of quiet enjoyment or
habitability, using common evidence. Equity also argues that
calculating damages requires an individualized assessment that
would either compensate uninjured tenants or require individual
proof for each tenant.

#### 1.   *Admitted Outage Date Theory*

As Equity points out, the forty-six email notices that
define the Admitted Outage Class describe a range of outages.
Some provide notice of a day-long outage, others of a brief

21

outage. Compare Dkt. No. 68-7 at 10 (explaining that the hot
water would be shut down from 8am to 4pm), with id. at 4
("[T]here will be a brief water shut-down on Friday night between
11PM and Midnight. This shut down should only last a few
minutes."). Some explain that an outage may occur, others that an
outage already occurred. Compare id. at 25 ("You may experience
hot water interruptions from 9:00am to 2:00pm."), with id. at 3
("[T]oday the water was shut off in both building
unexpectedly."). Given the variety of "admitted outages" that
define the class, Plaintiffs cannot rely on common evidence to
prove a quiet enjoyment violation for each tenant on each
"admitted outage" date. Where Equity notified its tenants that an
outage might occur, some tenants may have suffered from a loss of
heat or hot water while others may not have. For any outage of a
few hours or less, an apartment's location in the building,
proximity to the boiler systems, the timing of the outage, and
other unique factors may affect the heat conditions in the unit.
The Court cannot reasonably assume that each outage affected the
quiet enjoyment of each tenant similarly. Individual questions
about the impact on each tenant would overwhelm common questions.

    Although Plaintiffs may not proceed with the Admitted Outage
Class as currently defined, the Court need not jettison entirely
their theory of liability based on the "admitted outage" dates.
The predominance issue disappears for the habitability claim if

the class is modified to include only tenants who resided at
Walden Park on a day with a not insubstantial outage of heat or
hot water in violation of the Sanitary Code. Such an outage
likely affected the conditions in each apartment similarly.
Because a habitability claim asks only about the conditions in an
apartment, not about the tenant's use of the apartment,
Plaintiffs can make their case for breach of the implied warranty
of habitability for substantial outages using common proof.[1]

The Admitted Outage Class does not satisfy predominance for
the quiet enjoyment claim, however. Because a quiet enjoyment
claim focuses on a tenant's use and enjoyment of his or her
apartment, not just on the conditions in the apartment, even a
substantial outage would not affect all tenants similarly.
Plaintiffs would need to present important individual proof
concerning each tenant's use of his or her apartment on the day
in question, which would overwhelm any common questions.

Calculating damages does not create a predominance problem
for the Admitted Outage Class's habitability claim. The measure
of damages for a habitability violation is the difference between

---

[1]     One factor courts consider in determining whether a
violation of the Sanitary Code is material or substantial is
"whether the defects resulted from abnormal conduct or use by the
tenant." Casey, 835 N.E.2d at 618-19. While this factor would
call for individual proof about each tenant, it seems unlikely a
tenant's abnormal use of his apartment would affect the supply of
heat or hot water.

the value of the apartment as warranted and its value in the defective condition. Wideman, 633 N.E.2d at 387. An expert for Plaintiffs opines "that the market rent of a unit within Walden Park during the specified dates when heat and hot water were not available was $0.00." Dkt. No. 37-4 at 20. Accordingly, Plaintiffs plan to calculate the daily rent for each tenant (from their contract monthly rental rate) and then multiply that daily rent by the number of outage days for which the tenant resided at Walden Park.

Equity assails this method for its unreasonable and unsupported assumption that the fair market value of an apartment on a day in which it does not have heat or hot water is zero. While Equity's criticism is sensible for outage days when the heat or hot water went out for only a few minutes, the Admitted Outage Class as modified covers only days in which the outage was substantial, as determined by a jury. In any event, a substantial heat or hot water outage should reduce the value of the typical apartment by the same amount. The jury will ultimately decide how much to discount the value of the apartments based on the evidence presented at trial. The important point at this stage is that the parties can use common evidence to establish this amount. Furthermore, while the contract rent is not always dispositive of the value of the apartment as warranted, see Haddad, 576 N.E.2d at 668, Equity provides no reason to believe

24

that the contract rent does not represent the value of the apartment as warranted for the units at Walden Park. Plaintiffs' damages model consists of a "mathematical formula" involving a common discount from individual rents that are easily ascertainable from "objective criteria." Smilow, 323 F.3d at 40. Such a method of calculating damages does not defeat class certification. Id.

Equity also argues that the class must be decertified under Comcast Corp. v. Behrend, 569 U.S. 27 (2013), because Plaintiffs cannot prove damages using solely common proof. But "Comcast . . . did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis." Roach v. T.L. Cannon Corp., 778 F.3d 401, 407 (2d Cir. 2015); see also Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 374-75 & n.10 (3d Cir. 2015) (collecting cases). Instead, under Comcast, "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." Roach, 778 F.3d at 407; see also Comcast, 569 U.S. at 35 (explaining that "a model purporting to serve as evidence of damages . . . must measure only those damages attributable to" the theory of liability "accepted for class-action treatment"). Assuming Plaintiffs prove that a substantial heat or hot water outage constituted a breach of the implied

warranty of habitability, their damages model compensates class members for only the reduction in the value of their apartments for the days at issue.

### 2.   Systemic Outage Theory

Plaintiffs emphasize that they can prove liability by demonstrating that Equity systematically failed to provide and maintain workable heat and hot water systems in the two Walden Park buildings over a long period of time. This theory of liability represents a cognizable quiet enjoyment claim. A tenant who loses heat and hot water frequently because of faulty systems has suffered a serious interference with his or her use of the apartment. See Abdeljaber v. Gaddoura, 801 N.E.2d 290, 295 (Mass. App. Ct. 2004) (finding breach of the covenant of quiet enjoyment where the landlord did not provide adequate heat in two nonconsecutive months).

This theory of systemic failure to provide heat and hot water is also actionable as a material breach of the Sanitary Code and thus the implied warranty of habitability. See 105 Mass. Code Regs. 410.190 ("The owner shall provide and maintain in good operating condition the facilities capable of heating water."); id. 410.200 ("The owner shall provide and maintain in good operating condition the facilities for hearing every habitable room . . . ."); id. 410.351 (requiring a landlord to "maintain free from leaks, obstructions or other defects" certain

equipment, including "waterheating facilities" and "heating
equipment").

This theory of liability raises common questions because it
focuses on Equity's provision and maintenance of its systems
instead of the effect of the outages on conditions in individual
apartments. Plaintiffs have numerous complaints from tenants over
the course of two years about heat and hot water problems, emails
from Equity with notice of heat or hot water outages, testimony
from Baker and Dittmann about their experience at Walden Park,
and testimony from Equity employees about the failed attempts to
fix the systems. Plaintiffs do not need to demonstrate the
individual conditions in each apartment if they show that outages
were sufficiently frequent to render any apartment uninhabitable
or interfere with any tenant's use and enjoyment of his or her
apartment. Equity's fault, which is relevant for the quiet
enjoyment claim, is also a question for which Plaintiffs can use
common proof of Equity's knowledge of the heat and hot water
problems and its attempts to fix the systems. Common questions
therefore predominate over individual questions for this systemic
theory of liability for both the quiet enjoyment and habitability
claims.

Plaintiffs assert that they may litigate this theory of
liability on behalf of the Admitted Outage Class as currently
defined. They argue that identifying the tenants who lived at

Walden Park on any "admitted outage" date is a proxy for identifying the tenants injured by the alleged failure to provide and maintain adequate heat and hot water systems. However, a tenant who only lost heat or hot water briefly on one "admitted outage" day of a month-long tenancy has not suffered a breach of quiet enjoyment or habitability from the systemic outage. Plaintiffs have not showed that the heat and hot water systems were out so consistently that a tenant who lived at Walden Park for only short period of time suffered a serious inference with his or her use of the apartment or a material breach of the warranty of habitability. Because short-term tenants may not have suffered from the systemic heat and hot water issues, their individual issues predominate over common issues.

The Court therefore modifies the class to include only tenants who lived at Walden Park for the entire period between April 12, 2012 to April 24, 2014 ("Systemic Outage Class").[2] Since the outages occurred fairly consistently throughout the two-year period and across the two buildings, any tenant who resided at Walden Park throughout this period could rely on the frequency of

---

[2]    Given the size of the Walden Park buildings (231 apartments) and the fact that tenants typically rent residential apartments for at least one year, this modified class likely satisfies numerosity. See Henderson v. Bank of N.Y. Mellon, N.A., 332 F. Supp. 3d 419, 426 n.3 (D. Mass. 2018) ("[A] proposed class of 40 or more generally meets numerosity in the First Circuit.").

outages to show a breach of quiet enjoyment or habitability without proof of the conditions within his or her specific apartment. Plaintiffs can therefore use their theory of systemic heat and hot water issues to prove classwide liability. See Tyson Foods, 136 S. Ct. at 1046 (noting that plaintiffs can use certain evidence to prove classwide liability if "each class member could have relied on [it] to establish liability if he or she had brought an individual action").

Calculation of damages does not pose an obstacle for certification of the Systemic Outage Class for the quiet enjoyment claim. A prevailing tenant is entitled to the greater of his actual and consequential damages or three months' rent. See Mass. Gen. Laws ch. 186, § 14. Plaintiffs waive any claim to actual and consequential damages and seek three months' rent for each class member. As with the habitability claim for the Admitted Outage Class, calculation of three months' rent involves a simple mathematical formula based on individual evidence that is easily ascertainable from objective criteria. Smilow, 323 F.3d at 40. While Equity argues that three months' rent raises a Comcast problem because it overcompensates tenants for relatively minor breaches of the covenant of quiet enjoyment, the Massachusetts legislature enacted this statutory remedy to encourage tenants to seek relief. See Darmetko, 393 N.E.2d at

398. Moreover, the class definition only includes long term tenants who suffered from numerous outages.

A prevailing tenant does not have a comparable statutory damages remedy for a habitability claim and instead must prove actual damages. Each tenant would be entitled to the reduction in value of their apartment due to the faulty heat and hot water systems. The problem for Plaintiffs is that their real estate expert only provided an opinion as to the value of an apartment without heat and hot water for a single specified date. The evidence in the record, however, suggests that the heat and hot water problems did not occur on a daily basis or to the same degree each time. The expert did not render an opinion as to the value of an apartment unit affected by systemic outages. To rely on the expert's opinion, each tenant would need to prove the number of days in which he suffered a substantial loss of heat or hot water in his apartment for specified days. The Admitted Outage Class already represents this theory of damages, and the Court has insufficient evidence to support a common damage theory for a broader class for the habitability claim.

3.   *Unjust Enrichment and Chapter 93A Claims*

Neither party discusses whether continued class certification is appropriate for the unjust enrichment and Chapter 93A claims. The state court expressly certified the

Conversion Class and Admitted Outage Class for the Chapter 93A
claim but was silent about the unjust enrichment claim.

Determining whether Equity received unjust rent payments
from its tenants because it provided apartments that were worth
less than the contract rental amount relies, like the
habitability claim, on the conditions in each apartment and the
value of each apartment in its defective condition. However,
because unjust enrichment is only an alternative theory of
liability where there is an inadequate remedy at law and the
Admitted Outage Class is certified for the habitability claim,
the unjust enrichment claim is not viable.

Plaintiffs' theory of liability under Chapter 93A rests on
both their quiet enjoyment and habitability claims. See Thomas,
633 N.E.2d at 395; Casey, 835 N.E.2d at 620. If Plaintiffs can
prove liability for the underlying quiet enjoyment or
habitability claim using common proof, they can do so for the
Chapter 93A claim as well.[3]

---

[3]    If Plaintiffs decide to seek multiple damages for a willful
or knowing violation of Chapter 93A, they can do so via common
proof of Equity's knowledge of the problems and its subsequent
attempts to fix the heat and hot water systems. The state court's
decision on Equity's partial motion for summary judgment that
Equity did not willfully or intentionally fail to provide heat
and hot water to its tenants would not prevent Plaintiffs from
seeking multiple damages. Chapter 93A calls for multiple damages
when a landlord acts not only willfully but also knowingly or in
reckless disregard of the uninhabitable conditions in the rental
unit. See Montanez v. Bagg, 510 N.E.2d 298, 300 (Mass. App. Ct.
1987).

### D.    Conclusion

For the foregoing reasons, the Court decertifies the

Conversion Class and declines to modify the class definition to

include the Riser Replacement Class. The Court modifies the

Admitted Outage Class to the following two classes:

> <u>Admitted Outage Class</u>: all persons who were tenants at
> Walden Park on a day between April 12, 2012 to April
> 24, 2014 in which there was a heat or hot water
> outage;

> <u>Systemic Outage Class</u>: all persons who were tenants at
> Walden Park in either building for the period between
> April 12, 2012 to April 24, 2014.

The Admitted Outage Class is certified for the habitability and

Chapter 93A claims. The Systemic Outage Class is certified for

the quiet enjoyment and Chapter 93A claims only.[4]

### III.  <u>**Motion for Summary Judgment**</u>

Equity's argument for summary judgment on Plaintiffs' quiet

enjoyment claim (Count II) rests on a novel theory of statutory

interpretation: that the clause in Mass. Gen. Laws ch. 186, § 14

---

[4]    In a footnote to its motion for summary judgment, Equity
states that the Court's resolution of its motion to decertify may
affect subject matter jurisdiction under CAFA. Equity is
presumably referring to CAFA's $5 million amount-in-controversy
requirement. However, the amount-in-controversy inquiry focuses
on the time of removal, and "[e]vents subsequent to removal that
reduce the amount in controversy below the jurisdictional minimum
do not divest a federal court of jurisdiction." <u>Amoche v.
Guarantee Tr. Life Ins. Co.</u>, 556 F.3d 41, 51 (1st Cir. 2009).
Accordingly, regardless of how the Court's resolution of Equity's
motion to decertify has affected the amount in controversy, the
Court retains jurisdiction to rule on Equity's motion for summary
judgment and proceed to trial.

that renders a landlord liable if he "directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant" does not incorporate a common law quiet enjoyment claim for failure to provide heat or hot water. The Massachusetts Supreme Judicial Court, however, has interpreted this provision to recognize exactly the type of claim Plaintiffs bring here. See Thomas, 633 N.E.2d at 395 (finding a violation of § 14 where the landlord negligently failed to provide heat and hot water); see also Simon, 431 N.E.2d at 565 (explaining that § 14 incorporates the common law caselaw on quiet enjoyment).

Allowing Plaintiffs' quiet enjoyment claim to proceed does not render superfluous the clause of § 14 prohibiting "willfully or intentionally fail[ing] to furnish" essential utilities, including heat and hot water. That clause encompasses a brief, but intentional, loss of heat or hot water that would not constitute a serious interference under the quiet enjoyment clause. Equity's argument that Plaintiffs cannot prevail on a quiet enjoyment claim without proving actual or consequential damages is frivolous, as § 14 includes a provision for statutory damages equivalent to three months' rent. See Darmetko, 393 N.E.2d at 39 (recognizing that the statutory minimum damages of three months' rent provide "an incentive to the pursuit of relief where the actual and consequential damages are slight or are

difficult to prove"). Equity is not entitled to summary judgment on Count II.

Equity also moves for summary judgment on Plaintiffs' Chapter 93A claim (Count V). In their complaint, Plaintiffs raise two theories of liability under Chapter 93A. First, they allege that Equity engaged in unfair and deceptive settlement practices. Plaintiffs waived this theory at the hearing. Second, they claim that Equity's breaches of quiet enjoyment and habitability also constitute violations of Chapter 93A. Equity argues that Plaintiffs cannot prove the heat or hot water temperatures in any given "dwelling unit" to make out a violation of the regulations that define an unfair or deceptive act in the landlord-tenant context. See 940 Mass. Code Regs. 3.17. Equity provides no caselaw to support the proposition that a tenant needs temperature readings in a specific apartment to prove a violation of the regulations. More importantly, Equity's argument ignores that a tenant can establish a Chapter 93A violation independent of the regulations based on an underlying habitability or quiet enjoyment violation. See S. Bos. Elderly Residences, 76 N.E.3d at 286; Dorgan, 473 N.E.2d at 1153 n.3. The Court therefore denies Equity's request for summary judgment on Count V.

## ORDER

Accordingly, Equity's motion to decertify (Docket No. 36) is **ALLOWED IN PART** and **DENIED IN PART**. Equity's motion for summary judgment (Docket No. 38) is **DENIED**.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge